**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, Plaintiff,**

and

**Railway Labor Executives Association, Intervener Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Erie-Lackawanna Railroad Company, Intervener Defendant.**

**Civ. A. No. 20575.**

United States District Court
E. D. Michigan, S. D.

Dec. 7, 1960.

William G. Mahoney, Washington, D. C., George E. Brand and George E. Brand, Jr., Detroit, Mich., for plaintiff and intervener plaintiff.

Robert A. Bicks, Asst. Atty. Gen., Richard H. Stern, Dept. of Justice, Washington, D. C., Orrin C. Jones, Asst. U. S. Atty., Detroit, Mich., Robert W. Ginnane, Gen. Counsel, ICC, Washington, D. C., Leonard S. Goodman, ICC Washington, D. C., for United States and ICC, defendants.

Rowland L. Davis, Jr., New York City, Cravath, Swaine & Moore, New York City, Ralph L. McAfee, New York City, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., Richard D. Rohr, Detroit, Mich., for intervener defendant.

Before O'SULLIVAN, Circuit Judge, LEVIN, Chief Judge, and THORNTON, District Judge.

THORNTON, District Judge.

A statutory three-judge court was convened pursuant to 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321–2325, to hear and determine the issue presented by the complaint here filed. This Court is asked to enjoin and set aside an order of the Interstate Commerce Commission (hereinafter also referred to as either the Commission or the ICC), dated September 13, 1960 and effective October 17, 1960, approving the merger of the

Erie Railroad Company and the Delaware, Lackawanna and Western Railroad Company. The argument upon which the relief sought is premised is single in its thrust. The issue for determination is a narrow one. The order of the Commission which is being attacked contains certain provisions pursuant to 49 U.S.C.A. § 5(2) (f) of the Interstate Commerce Act (also known as the Transportation Act of 1940). It is with the interpretation of 49 U.S.C.A. § 5(2) (f), hereinafter referred to as 5(2) (f) that we are concerned. We here quote 5(2) (f), underlining the words which are the crux of this controversy:

"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that *during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment,* except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

The sole question presented is whether this provision requires the Interstate Commerce Commission to impose as a minimum upon every transaction approved by the Commission under Section 5(2) the condition that every employee affected must be retained in an *employment status* for a period equal in time to his service with the railroad carrier, not to exceed four years. The Commission, in its order of September 13, 1960, prescribed the so-called "New Orleans Conditions" which grant employees compensatory protection in the event of displacement or discharge.

We should perhaps here state that the merger has in fact gone ahead as per the effective date of the order with the exception of those terms which were imposed to comply with the provisions of 5(2) (f). The status of the employees of the merging railroads has not been disturbed pending this Court's decision. Such procedure was agreed upon by the respective parties at the time of the hearing on the motion for a temporary restraining order which was noticed for hearing, and held, shortly prior to the effective date of the Commission's order. The merged railroad, now the Erie-Lackawanna Railroad Company, has since become an intervening defendant by virtue of substitution for the two railroads.

To aid us in arriving at a proper conclusion the parties have submitted briefs, copies of reports relative to the proposed merger, copies of Congressional Committee reports and of pertinent sections of Congressional debates, copies of agreements (to protect employees) heretofore incorporated in prior railroad merger or combination proceedings, and copies of the proceedings before the Commission. The "New Orleans Conditions", above referred to and contained in the order of the Commission approving the merger, were compensatory protective conditions which were prescribed in ICC orders entered in railroad merger proceedings involving parties different from those here, such proceedings having taken place in New

Orleans. The "New Orleans Conditions" do not embrace continued employment. We do not deem it important to our decision that these conditions be set forth here. It is plaintiffs' contention that *anything* short of actual continued employment is violative of the language and intendment of 5(2) (f) with respect to the phrase therein "being in a worse position with respect to their employment." Section 5(2) (f) requires protective conditions which are to be continued for a period of four years [1] for employees of the merging carriers. This is agreed. But the interpretation of the extent of such benefits and of the mandate of 5(2) (f) is presented to us in two sharply contrasting outlines.

We believe it to be without dispute that this is the first instance since the 1940 enactment of 5(2) (f) that there has been an attempt to get judicial (or ICC, for that matter) recognition of the construction now placed by plaintiffs on 5(2) (f). In no case that has been called to the Court's attention has the construction urged by plaintiffs been placed on this Section. In no case has the proposition advanced here been previously advanced. In the numerous cases that have come before the ICC where 5(2) (f) conditions were required to be met, they were considered to have been met by various compensatory plans, continued employment not being one of them. From our reading of 5(2) (f) we are unable to find a clear expression, as plaintiffs contend, that continued employment of affected employees is required to be imposed. We believe that ordinary every-day logical reading of 5(2) (f) mitigates against plaintiffs' contention. The phrase here in issue, "in a worse position with respect to their employment" is couched in such general language as to hardly be susceptible of being interpreted as requiring any specific condition, much less that of guaranteed employment. It would appear to have been a simple

matter to have incorporated the concept of continued employment in this sentence, had such been the intention of Congress. The plaintiffs' contention that the language "in a worse position with respect to their employment", being broader in scope than language granting "compensation", is that employees are required to be retained in an employment status following a merger. We do not agree that this language should be so construed. Congress could have used language clearly stating that the railroads may not discharge affected employees. Congress did precisely that in the Emergency Railroad Transportation Act of 1933, 48 Stat. 211, and the Communications Act of 1934, 47 U.S.C.A. § 222(f). It is our observation, therefore, that insofar as the plain language of 5(2) (f) is concerned, a literal approach giving effect to each phrase therein, necessitates denying the construction contended for by plaintiffs. This is to say that we do not consider that there is ambiguity within the structure of 5(2) (f). Under ordinary rules of statutory construction we would be precluded from pursuing any further line of inquiry. However, both parties to this cause claim support for their respective contentions in the legislative and operational history of the Act. We therefore review such history.

First, as the Act was originally proposed and adopted, it did not contain the specific language which is before us. As then proposed it clearly would not have called for job security or "job freeze" as a condition to authorizing a merger of railroads. It is clear also that Representative Harrington of Iowa sought to have an amendment adopted to the proposed Act which would provide that no employee should be displaced or his job impaired by a railroad merger. It appears that, as originally proposed, the so-called "Harrington Amendment" would have required such conditions to be imposed. From the offering of this amendment until the Act was finally

---

[1]. This is modified with respect to employees in the service of the railroad less than **four years**.

adopted, the issue of whether or not "job freeze" should be a condition of any merger, was clearly and distinctly before the members of Congress. Whether such condition should be followed was discussed, pro and con, during the time this legislation was considered. The Harrington Amendment as originally proposed provided:

"No such transaction shall be approved by the Commission if such transaction shall result in *unemployment or displacement of employees of the carrier or carriers*, or in the impairment of existing employment rights of said employees."[2] (Emphasis supplied.)

Such amendment was not adopted into law, nor does the Act as it exists contain any language which might be said to be equivalent to what Mr. Harrington proposed. It is clear that the members of Congress knew what the Harrington Amendment sought to accomplish and refused to include that language or its equivalent.

Second, at the time of, and following, the enactment of the Section now before us, representatives of the plaintiffs in this cause gave public expression to, and understanding of, what was accomplished by the Section before us, and clearly asserted that it was their understanding that protection was to be afforded by way of compensation to such employees as would lose their jobs or be displaced as a consequence of a merger.[3]

■ Third, the application and construction of the Section have been before the ICC in many cases during the twenty years since the enactment of the Transportation Act of 1940. Consistently and clearly, the ICC has interpreted the particular language in the same manner as it now contends it should be construed. It is true that the issue now made by plaintiffs in this case was not presented to, nor passed upon, by the ICC in any of the cases adjudicated in the preceding twenty years. Neither, however, did these plaintiffs, as representatives of the employees involved, there make the contention that is being made in the instant proceeding. The ICC in its 1941 report referred to 5(2) (f) as granting only compensatory benefits. Such a contemporaneous administrative construction of a statute is entitled to great weight and indeed the Commission has never deviated from that interpretation. The plaintiffs contend that they have never challenged the Commission's interpretation because only in recent years have wholesale mergers occurred in the railroad industry with the resultant effect of a reduction in employment opportunities. However, in at least one prior large scale merger compensatory relief was afforded employees.[4]

Fourth, it is clear also that since 1940 the United States Congress has been aware of the construction placed upon the Act by those interested in its interpretation and enforcement. It has not seen fit to indicate by any attempted clarification of the Act its disagreement with the construction uniformly placed upon it in the intervening years.

Two decisions of the Supreme Court which have been cited and argued by all parties to this controversy in support of their respective positions should be

---

2. 84 Cong.Rec. 9882 (1939).

3. See Brotherhood of Maintenance of Way Employes' Journal, volume XLIX, pages 13 and 14 (October 1940); The Railway Conductor, volume 57, page 308 (October 1940); Locomotive Engineers' Journal, page 725 (October 1940); Brotherhood of Locomotive Firemen and Enginemen's Magazine, page 223 (October 1940); Railway Clerk, Official Journal of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, pages 467 and 488.

4. The Louisville and Nashville Railroad Company Merger, 295 ICC 457 (1957), affirmed City of Nashville, Tennessee v. United States, D.C.M.D.Tenn.1957, 155 F.Supp. 98, affirmed 1957, 355 U.S. 63, 78 S.Ct. 139, 2 L.Ed.2d 106.

mentioned. This Court, however, deems both decisions inapposite to the issue here. In Railway Labor Executives' Association v. United States, 1950, 339 U. S. 142, 70 S.Ct. 530, 94 L.Ed. 721 the Supreme Court held that the four-year limitation in 5(2) (f) provided only a minimum period of protection for employees and that the first sentence of 5(2) (f) still required the Commission to arrange a fair and equitable solution and protect the interests of the railroad employees. In Order of Railroad Telegraphers v. Chicago & North Western Railway Co., 1960, 362 U.S. 330, 80 S. Ct. 761, 4 L.Ed.2d 774, the sole question was whether a strike arising out of the railroad carriers' refusal to negotiate an agreement with a union that would prevent the railroad from abolishing any position was a "labor dispute" within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq. It is interesting to note that in this decision Mr. Justice Whittaker, writing for the four dissenting justices, specifically stated at pages 355 and 357 of 362 U.S., at pages 774, 775 of 80 S. Ct. that, under 5(2) (f) of the Act, the Commission had no authority to "freeze existing jobs". The majority opinion, however, never reached this question.

One additional observation may be in order. The decision of this Court that 5(2) (f) provides only compensatory benefits is supported by the general policy of the ICC which is to promote "safe, adequate, and efficient service and foster sound economic conditions in transportation." A requirement that carriers retain employees following mergers would sterilize provisions of the Act which is designed to promote economy partially through the reduction of personnel. It seems to us that if Congress had intended such a result it could have, and would have, said so in unequivocal language.

The temporary restraining order will be set aside and the complaint dismissed. An order in accordance with the foregoing may be presented.