# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 30, 2024

Lyle W. Cayce
Clerk

_____

No. 23-20494

_____

Elizabeth Escobedo,

*Plaintiff—Appellee*,

*versus*

Ace Gathering, Incorporated,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-538

_____

ON PETITION FOR REHEARING EN BANC

Before Higginson, Willett, and Oldham, *Circuit Judges*.

Per Curiam:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

In the en banc poll, 5 judges voted in favor of rehearing, Judges Smith, Elrod, Willett, Duncan, and Oldham, and 12 voted against rehearing, Chief

Judge Richman and Judges Jones, Stewart, Southwick, Haynes, Graves, Higginson, Ho, Engelhardt, Wilson, Douglas, and Ramirez.

ANDREW S. OLDHAM, *Circuit Judge*, joined by SMITH, ELROD, WILLETT, and DUNCAN, *Circuit Judges*, dissenting from the denial of rehearing en banc:

The question presented is whether *intra*state truck drivers transport crude oil in "*inter*state commerce"—as that term is defined in the Motor Carrier Act ("MCA") and the Fair Labor Standards Act ("FLSA"). Supreme Court precedent directs us to take a textualist approach to this statutory scheme. *See Encino Motorcars LLC v. Navarro*, 584 U.S. 79, 89 (2018) (requiring a "fair reading" of the FLSA's text). A heap of Fifth Circuit precedent, however, requires us to ignore *Encino Motorcars* and the statutory text. When we fail to correct obviously wrong circuit precedent, it places undue strain on our rule of orderliness by requiring judges to hold their noses while saluting. I respectfully dissent.

I

In 1971, the Department of Labor issued an interpretive rule exempting certain employees from federal overtime requirements. *See* 29 C.F.R. § 782.0; *cf.* 29 U.S.C. § 213(b)(1). That rule created an exemption for employees who "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in *interstate or foreign commerce within the meaning of the Motor Carrier Act*." *See* 29 C.F.R. § 782.2(a)(2) (emphasis added). In that Act, Congress narrowly defined both forms of commerce: Interstate commerce includes "commerce between any place in a State and any place in another State or between places in the same State through another State . . . ." Pub. L. No. 74-255, § 203(a)(10), 49 Stat. 543, 544 (1935). And foreign commerce includes "commerce between any place in the United States and any place in a foreign country, or between places in the United

States through any foreign country . . . ." *Id.* § 203(a)(10). That is, Congress statutorily limited "interstate commerce" to movement across state lines.[1]

As all veterans of Con Law know, the Supreme Court has taken a very different approach to "Commerce . . . among the Several States" as that phrase is used in the Constitution. U.S. CONST. art. I, § 8, cl. 3; *see Wickard v. Filburn*, 317 U.S. 111 (1942). In *Wickard*, for example, the Court considered an agriculture regulation that allowed Roscoe Filburn to sow only 11.1 acres of wheat and to harvest only 20.1 bushels of wheat per acre on his Ohio farm. *Wickard*, 317 U.S. at 114. Filburn defied the regulation: He sowed an extra 11.9 acres and harvested an extra 239 bushels of wheat. *See ibid.* For that sin, the Government fined Filburn $117.11, revoked the marketing card that allowed him to sell any wheat, and imposed a lien upon his entire wheat crop. *See id.* at 115.

That did not deter Filburn. He had an immense "sense of pride" and once said "I never worked for another man in my life." Jim Chen, *Filburn's Legacy*, 52 EMORY L.J. 1719, 1734 (2003). It is easy to understand why a man of that constitution would bristle at a government order limiting how he used his own land and how much wheat he could produce for his own family. So rather than pay the fine, Filburn filed suit. *See id.* at 1736.

---

[1] Congress further delimited the definition of interstate commerce in a saving clause: "Nothing in [the Act] shall be construed to . . . interfere with the exclusive exercise by each State of the power of regulation of *intra*state commerce by motor carriers on the highways thereof." Pub. L. No. 74-255, § 202(c), 49 Stat. 543, 543 (1935) (emphasis added); *see also United States v. Cap. Transit Co.*, 338 U.S. 286, 292 (1949) (Vinson, C.J., joined by Reed and Jackson, JJ., dissenting) (describing the Act as "bar[ring] . . . regulating intrastate transportation on the ground that it affects interstate transportation").

Poor Filburn lost again, alas.[2] The Supreme Court held it would not matter if Filburn's wheat never crossed state lines. 317 U.S. at 128–29. And it would not matter if Filburn never sold his wheat to *anyone*, inside or outside of Ohio. *Id.* at 129. How so? The Court reasoned that if a man like Roscoe grew and consumed his own wheat, he would buy less or no wheat on the open market—thus depressing the very market prices the Government wanted to support. *Id.* at 128. And no matter that Filburn's wheat was an infinitesimal portion of the millions and millions of acres of wheat harvested across the United States because if all the Nation's Filburns used home-grown wheat, the aggregation "would have a substantial effect" on commerce. *Id.* at 127–28, 129. The upshot: When it comes to the Constitution's Commerce Clause, virtually any productive activity—including wholly intrastate activity—is fair game. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 27–29 (2005).

While the Supreme Court has interpreted the Commerce Clause to allow regulation of *intra*state *activity*, the statutory text in this case reaches only *inter*state *commerce*. True, this court has held the Commerce Clause allows regulation of subterranean, eyeless arachnids, ranging in size from 1.4mm to 4mm, that are born, reproduce, and die without ever leaving a cave in Texas and have zero connection to economic activity of any kind. *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 625, 638–41 (5th Cir. 2003). But

---

[2] Filburn lost more than the Supreme Court case:

In 1966, a quarter-century after initiating his attack on the agricultural New Deal, he persuaded other successors to his grandparents' original 640-acre farmstead to sell their land for development. The Salem Mall in Dayton, Ohio now occupies much of the land farmed by Filburn's extended family . . . . The ninety-five acres that he farmed became a residential subdivision; the adjoining nine acres of forest became commercial real estate.

Chen, 52 Emory L.J. at 1767.

the MCA and FLSA are far narrower than that constitutional limit: By their text, the exemption reaches only bona fide commerce that *actually* crosses state lines. *See also United States v. Cap. Transit Co.*, 338 U.S. 286, 292 (1949) (Vinson, C.J., joined by Reed and Jackson, JJ., dissenting) (noting Congress did not "use[] the full extent of its commerce power" with the Motor Carrier Act.).

## II

Rather than follow the text of the MCA and FLSA, our court has openly departed from it. *See, e.g.*, *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (noting that the MCA's definition of interstate commerce "has not been applied literally by the courts" (citation omitted)). We have devised unmanageable standards that turn on unknowable decisions by absent third parties who might eventually ship a good across state lines. *See Merchs. Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976) (asking whether a good is "ultimately bound" for out-of-state destinations). We have devised statutory tests that consider the unknowable, subjective intentions of the defendant. *See Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 917 (5th Cir. 1993) (asking whether "the fixed and persisting intent of the shipper" implicates interstate commerce). We have developed a six-factor balancing test to determine a shipper's intent to "move goods continuously in interstate commerce." *See Siller v. L&F Distributors, Ltd.*, 109 F.3d 765, *2 (5th Cir. 1997). Even then, the "totality of all the facts and circumstances" may change the inquiry. *Ibid.* And we have developed yet another eight-factor balancing test to assess whether a class of employees has a "reasonable expectation" of interstate transportation. *See Olibas v. Barclay*, 838 F.3d 442, 449 n.11 (5th Cir. 2016). Of course, no factor is necessary, and none is dispositive. *See ibid.*

None of this makes any sense. *See Escobedo v. Ace Gathering, Inc.*, 109 F.4th 831, 837 (5th Cir. 2024) (Oldham, J., concurring in judgment). In *Encino Motorcars*, the Supreme Court told us to follow the statutory text. 584 U.S. at 89; *see also TNT Crane & Rigging, Inc. v. Occupational Safety & Health Rev. Comm'n*, 74 F.4th 347, 353 (5th Cir. 2023) ("In construing a regulation, we give effect to the natural and plain meaning of the regulation's words.") (internal quotation marks and citation omitted). It is error to ignore that instruction in favor of atextual circuit precedent. Moreover, our circuit precedent is profoundly unmanageable, confused, indeterminate, and unhelpful. It is unclear how any party (or future panel of this court) could ever hope to apply our multiple, multi-factor balancing tests with any degree of principle or coherence. And this entire jurisprudential project is rooted in doctrinal conflation: While the MCA's text explicitly requires movement of commerce across state lines, our precedent explicitly does not.

The only rationale I can imagine for that mistake is that a past panel saw the phrase "interstate commerce" in the MCA, associated that with "Commerce . . . among the several States" in the Constitution, and then interpreted the former as if it had all the leeway afforded by the latter. *See, e.g.*, *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1229 n.15 (11th Cir. 2009) (per curiam) (describing the MCA and Commerce Clause inquiries as "similar"). Then, as if proving the butterfly effect from chaos theory, subsequent panels *also* conflated the MCA with the Commerce Clause and *also* channeled the spirit of *Wickard*—thus pulling the doctrine further and further from the statutory text. *Cf.* EDWARD LORENZ, THE ESSENCE OF CHAOS 181 (1993).[3]

---

[3] The butterfly effect describes the compounding effect of a minor errors, which can amplify one another over time and eventually cause major damage. Lorenz describes his observation of it: "The initial round-off errors were the culprits; they were steadily amplifying until they dominated

The result might not be a tornado in Texas, *see ibid.*, but it is a pile of erroneous precedent that bears no relationship to the MCA or FLSA.

En banc review is designed for cases like this. And the rule of orderliness operates in its shadow: We afford precedential value to panel decisions under the assumption that the en banc court can *and will* correct errors. *See Wisniewski v. United States*, 353 U.S. 901, 902 (1957) ("[D]esirable judicial administration commends consistency at least in the more or less contemporaneous decisions of different panels of a Court of Appeals . . . It is primarily the task of a Court of Appeals to reconcile its internal difficulties."). It is a shame that we fell short of that responsibility here.

## III

Finally, a word about the opposition to the petition for en banc rehearing ("EB Opp."). The lead argument in that opposition is that plaintiffs somehow "waived" or "forfeited"[4] the correct interpretation of the MCA.[5] EB Opp. at 2. This is profoundly confused for multiple reasons.

---

the solution . . . . [T]here was chaos." LORENZ, *supra*, at 136. The provocative title for his first lecture on the topic asked whether "the Flap of a Butterfly's Wings in Brazil Set off a Tornado in Texas?" *Id.* at 181.

[4] While the opposition uses these terms interchangeably, they are not the same: "The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 n.1 (2017). *See also United States v. Cabello*, 33 F.4th 281, 295 (5th Cir. 2022) ("Forfeiture is the failure to make the timely assertion of a right. Waiver, in contrast, is the intentional relinquishment or abandonment of a known right."). Correctly understood, the opposition accuses Escobedo of forfeiting a statutory argument. So I use that term here.

[5] The opposition also argues we should not revisit our precedent because several other circuits interpret the MCA to cover intrastate activity. EB Opp. at 13–14. But these cases likewise ignore the Supreme Court's direction and do not bind us to make the same mistakes.

First, a party cannot forfeit the law. It has long been settled that "[a] court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous." *King v. United States*, 641 F.2d 253, 258 (5th Cir. Unit B Mar. 1981); *see also Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) (reviewing purported stipulation of fact, determining it instead stipulated to a question of law, then disregarding it). If a party cannot bind the court to a legal rule through stipulation, a party certainly cannot bind the court to that rule through forfeiture: "No one would argue that a court is free to ignore a binding precedent simply because the parties fail to cite it. Likewise, even when litigants agree on misstatements of law, courts must be free to articulate the correct legal standard when deciding their cases." Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J. 447, 494 (2009) (footnote omitted).

Second, a party can forfeit *issues* or *claims*—but not *arguments*. As the Supreme Court put it: "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."). In *Kamen*, for example, the respondent "argue[d] that petitioner waived[6] her right to the application of anything other than a uniform federal rule of demand because she failed to advert to state

---

[6] Again, confusion abounds. *See supra* n.4. The respondent presumably meant "forfeited."

law until her reply brief in the proceedings below." 500 U.S. at 99. The Court rejected that contention because the petitioner invoked federal common law as the basis for her claim; and to adjudicate that *claim*, a federal court must identify the source of federal common law (which includes state law)—without being bound to the precise *arguments* or *theories* petitioner offered. *Ibid.* Contrariwise, when a party altogether fails to raise a claim, it is forfeited. *See, e.g.*, *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

Third, a party does not forfeit a challenge to controlling precedent by failing to ask a panel to overturn it. "The parties will often hesitate to challenge a precedent directly, preferring to distinguish it from their case, and thus the Court may be forced to raise the issue on its own motion." Frost, 59 DUKE L.J. at 514; *see also id.* at n.229 (collecting examples where the Supreme Court overturned cases without requests from the parties). That rule makes sense because one panel is obviously powerless to overturn prior panel decisions, *see Gahagan v. United States Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018), so nothing can be gained by requiring a party to ask a panel to do the impossible. The corollary is equally obvious: The en banc court is not handcuffed by a party's failure to ask the nonetheless-bound-and-powerless panel to do something it could not do.

Fourth, our en banc court does not need a party to seek rehearing—much less do we need a party to ask us to overturn a precedent. We can do all of it *sua sponte*. For example, no petition for rehearing was filed in *Sparks v. Duval Cnty. Ranch Co.*, 604 F.2d 976 (5th Cir. 1976). *See id.* at 979 (noting the fact). That did nothing to prevent the en banc court from rehearing the case and then overturning precedents that no one asked it to overturn:

> We consider this case en banc to review the holding of our panel that private citizens, in conspiring with a state judge, did not conspire with any person against whom a claim valid under 42 U.S.C. § 1983 could be stated and thus themselves were entitled to dismissal of claims made against them under that statute. The panel, like the district court, acted under constraint of our prior opinions, opinions that it could not properly overrule. We can and do.

*Id.* at 978. Nor did it prevent the Supreme Court from affirming. *See Dennis v. Sparks*, 449 U.S. 24 (1980). Nor did it conflict with the well-worn practice of *sua sponte* judicial directives to brief whether an unchallenged case should nonetheless be overturned. *See, e.g., Citizens United v. FEC*, 557 U.S. 932 (2009) (mem.) (directing parties to brief whether the Court should overrule *Austin v. Mich. Chamber of Com.*, 494 U.S. 652 (1990) and *McConnell v. FEC*, 540 U.S. 93 (2003)); *Pearson v. Callahan*, 552 U.S. 1279 (2008) (mem.) (directing parties to brief whether the Court should overrule *Saucier v. Katz*, 533 U.S. 194 (2001)); *eBay Inc. v. MercExchange, LLC*, 546 U.S. 1029 (2005) (mem.) (directing parties to brief whether the Court should overrule *Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405 (1908)); *Hammoud v. Ma'at*, No. 19-50914, Doc. 94 (5th Cir. Apr. 29, 2021) (directing parties to brief whether the en banc court should overrule *Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001)).

In this case, there is no debate that Escobedo urged our court to hold the truck drivers did not engage in "interstate commerce" as that term is defined in the MCA. Red Br. 9. That squarely presented the issue. True, she did not ask the panel to do something it could not do—to overturn numerous Fifth Circuit

decisions that departed from the MCA's text. But that is irrelevant. By petitioning the en banc court that *can* overturn those decisions, and by asking us to overturn those decisions, she did *more* than is necessary to empower us to take this case. We could have taken the case en banc and followed the MCA's text in the absence of a petition *and* in the absence of a *stare decisis* argument from Escobedo. I trust none of my no-voting colleagues were persuaded by Ace Gathering's contentions to the contrary.

Still, for whatever reason, we refused to do the right thing here. I respectfully dissent.